[Cite as *King-Coleman v. Ohio Dept. of Rehab. & Corr.*, 2011-Ohio-5318.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ANGELIA Y. KING-COLEMAN, Admx.

    Plaintiff

    v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

    Defendant
    Case No. 2007-08937

Judge Clark B. Weaver Sr.

DECISION

{¶1} Plaintiff brought this action alleging medical malpractice.[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} Erick Coleman testified that in June 2005, he underwent a procedure to repair a gunshot wound in his left femur. As a part of the procedure, metal hardware and screws were surgically implanted in Coleman's left leg. On September 20, 2005, Coleman was admitted into defendant's care and custody, and on November 21, 2005, he was transferred to the North Central Correctional Institution (NCCI). Coleman testified that while at NCCI, he experienced pain and swelling in his leg and knee, difficulty walking, and that it was necessary for him to ice and elevate his leg whenever possible. Doctors later discovered that an infection had developed in Coleman's leg

---

[1] Plaintiff's May 12, 2010 motion to correct case caption is GRANTED and the clerk is directed to substitute Angelia Y. King-Coleman, Administratrix of the Estate of Erick Coleman, deceased, in place of Erick Coleman.

requiring removal of the infected hardware. Coleman subsequently learned that he had developed osteomyelitis in his leg.

{¶3} On September 11, 2006, Coleman was admitted to the Ohio State University Medical Center (OSU) where doctors removed the infected hardware from Coleman's left femur. Subsequent cultures were positive for methicillin-resistant staphylococcus epidermidis (MRSE). To treat the infection, Coleman was prescribed vancomycin, an antibiotic which was to be intravenously administered on a long-term basis.

{¶4} On September 14, 2006, Coleman was transferred to defendant's Corrections Medical Center (CMC) where he continued to receive vancomycin. According to CMC medical records, Coleman developed a low grade fever on September 26, 2006. (Plaintiff's Exhibit 3-2.) On September 28, 2006, Martin Akusoba, M.D., Medical Director at CMC, administered thorazine to Coleman for a case of the hiccups and ordered blood cultures to determine whether an infection was developing. CMC medical records indicate that on September 30, 2006, Coleman continued to run a fever and that he was given Tylenol. (Plaintiff's Exhibit 3-1.)

{¶5} On October 2, 2006, Coleman continued to run a fever at which time Dr. Akusoba prescribed the antibiotic, ciprofloxacin. Dr. Akusoba testified that prior to October 2, 2006, Coleman had not exhibited any sign of an adverse reaction to vancomycin. Dr. Akusoba explained that he prescribed ciprofloxacin in an attempt to treat any vancomycin resistant infection.

{¶6} Coleman testified that shortly after taking ciprofloxacin, he began to feel weak, his eyes began to burn, and he became very itchy. Coleman asserted that the nursing staff threatened to "put him in the hole" if he refused to take prescribed doses of ciprofloxacin. Dr. Akusoba testified that CMC does not have a "hole," or segregation unit, and that when a patient refuses medication, the patient is allowed to sign a document recording the refusal of the medication.

{¶7} Coleman testified that between October 2 and 4, 2006, his condition continued to deteriorate. Coleman stated that he began experiencing a severe rash, vomiting, difficulty swallowing, swollen throat, and blisters on his back, torso, mouth, nose, and ears, although the first documented blisters occurred at OSU on October 8, 2006. (Plaintiff's Exhibit 3-1.) Coleman testified that he was not seen by a doctor at CMC between October 2 and October 6, 2006, despite his rapidly deteriorating condition; however, according to CMC medical records, Charles Onwe, M.D., a physician at CMC, examined Coleman on October 4 and 5, 2006. Coleman testified that on multiple occasions between October 2 and 4, 2006, he reported his deteriorating condition, including his developing blisters, to CMC nursing staff, but that none of the nurses examined his blisters. According to a nurse's note dated October 5, 2006, Coleman had been complaining of pain and vomiting, but no vomit was observed. (Plaintiff's Exhibit 3-1.) Coleman asserted that by October 6, 2006, his condition had deteriorated to the point that he was unable to move or put on his orange jump suit.

{¶8} Dr. Onwe testified that on October 4, 2006, he discontinued ciprofloxacin after speaking with Coleman. Dr. Onwe explained that he did not discontinue vancomycin because it had been treating Coleman's MRSE infection for one month without an adverse reaction. Dr. Onwe asserted that he did not believe vancomycin was the offending drug. That same day, Dr. Onwe noted that Coleman was complaining of itchiness and had a low-grade fever. Dr. Onwe testified that he observed Coleman's skin, including his chest and back, and documented some pain and swelling in Coleman's left knee. Dr. Onwe further asserted that if Coleman would have had a rash at that time, he would have documented it.

{¶9} Dr. Onwe testified that on October 5, 2006, he examined Coleman and documented an elevated temperature and a sore throat but no rash. On October 6, 2006, Dr. Onwe again examined Coleman and documented an erythematous macular popular rash on Coleman's upper torso. That same day, Dr. Onwe determined that

Coleman was continuing to deteriorate and ordered him to be transported by ambulance to OSU. Coleman stopped receiving vancomycin on October 6, 2006.

{¶10} According to the medical records at OSU, upon arrival at the emergency room, Coleman's entire back and chest area were red and raised with a generalized rash. (Plaintiff's Exhibit 3-1.) The records do not identify the existence of any blisters on October 6, 2006. Coleman testified that he was subsequently diagnosed with Stevens-Johnson syndrome (SJS). As a consequence of developing SJS, Coleman explained that he had significant amounts of skin removed and that at the time of trial, he continued to experience dry skin, sensitivity to sunlight, inability to differentiate between colors, and inability to properly hydrate his eyes. Ultimately, both vancomycin and ciprofloxacin were added to Coleman's allergy list at CMC. (Plaintiff's Exhibit 3-1.)

{¶11} Plaintiff alleges that defendant was negligent in failing to respond to Coleman's complaints of itching, burning sensation, difficulty swallowing, rash, and blistering and that such negligence proximately caused Coleman to develop SJS and sustain permanent injuries. Plaintiff urges the court to apply the doctrine of res ipsa loquitor. Plaintiff further alleges that defendant was negligent in failing to document all of Coleman's complaints.

{¶12} Defendant denies liability arguing both that the medical records contradict Coleman's version of events and that the doctors and nurses fully complied with the standards of care. Defendant further asserts that the doctrine of res ipsa loquitor cannot be applied to this case inasmuch as plaintiff has failed to identify the instrumentality that caused Coleman's injury.

{¶13} In order to prevail on a claim of medical malpractice or professional negligence, plaintiff must first prove: 1) the standard of care recognized by the medical community; 2) the failure of defendant to meet the requisite standard of care; and 3) a direct causal connection between the medically negligent act and the injury sustained. *Wheeler v. Wise* (1999), 133 Ohio App.3d 564; *Bruni v. Tatsumi* (1976), 46 Ohio St.2d

127. The appropriate standard of care must be proven by expert testimony. *Bruni* at 130. That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. Id.

{¶14} Plaintiff presented the expert testimony of Tanyanyiwa Chinyadza, M.D., who is a physician licensed to practice medicine and is board certified in internal medicine and infectious diseases. Dr. Chinyadza testified that he has treated patients who have developed both MRSE and SJS. Dr. Chinyadza explained that SJS is a rare condition in which a patient develops a severe allergic reaction that typically manifests itself in the form of hives, rash, and an itch. According to Dr. Chinyadza, SJS can cause permanent damage to the muscular system as well as the skin, mouth, and intestinal tract. Dr. Chinyadza further explained that SJS can be caused by a "broad range of things" and that it is often difficult to determine the exact cause of SJS. Dr. Chinyadza testified that when treating SJS, the standard of care requires the doctor to stop the use of all suspected agents.

{¶15} After reviewing both CMC and OSU medical records and obtaining a detailed history of events from Coleman, Dr. Chinyadza opined that defendant had deviated from the standard of care by failing to discontinue the use of both antibiotics, vancomycin and ciprofloxacin, on October 4, 2006, and that such deviation proximately caused Coleman's permanent injuries. Dr. Chinyadza stated that vancomycin had been prescribed to inhibit osteomyelitis, an infection in Coleman's bone tissue later diagnosed as MRSE; and that such infection developed around the hardware used to treat Coleman's gunshot wound. Dr. Chinyadza testified that the administration of a long-term antibiotic, as had been prescribed in this case, was appropriate and that Coleman seemed to tolerate vancomycin well until his skin rash and blistering developed on or around October 4, 2006.

{¶16} According to Dr. Chinyadza, Coleman's symptoms of fever, hiccups, and sore throat were indications of a developing infection, and doctors should have

discontinued the use of vancomycin on October 4, 2006, when Coleman first developed a rash. He conceded, however, that the medical records fail to reveal a deviation from the standard of care on that date inasmuch as a rash was not reported until October 6, 2006. Dr. Chinyadza also acknowledged that although Coleman suffered a drug-induced SJS there is no way to establish with certainty that SJS was caused by vancomycin. He also admitted that if Coleman had been allowed to discontinue his antibiotics on October 4, 2006, the severity of his symptoms would have decreased but he would still have contracted SJS.

{¶17}    Defendant's expert, Bruce Farber, M.D., a board certified physician in internal medicine and infectious disease, testified that defendant did not breach the standard of care. Dr. Farber explained that SJS is an unpredictable reaction to some foreign agent. Dr. Farber asserted that doctors do not currently understand why or how SJS develops, but that it can be caused by a respiratory infection, a wide variety of drugs, or an allergic reaction the body produces to fight a foreign antigen. Dr. Farber testified that vancomycin is the drug of choice when treating an MRSE infection and that administration of such a drug was within the standard of care in this case. Dr. Farber based his testimony solely upon the medical records at CMC and OSU.

{¶18}    Dr. Farber stated that the addition of ciprofloxacin to extend antibiotic coverage on October 2, 2006, is common in such cases and that such added treatment was reasonable in Coleman's case. Dr. Farber testified that discontinuing ciprofloxacin but continuing vancomycin on October 4, 2006, was also within the standard of care inasmuch as Coleman's complaints of itching developed shortly after the introduction of ciprofloxacin. At that point, vancomycin had been administered on a long-term basis with no signs of an adverse reaction. Dr. Farber testified that it was reasonable and appropriate to continue vancomycin for the treatment of the MRSE infection.

{¶19}    Dr. Farber testified that when Coleman arrived at OSU on October 6, 2006, he did not have typical SJS. Dr. Farber explained that in a typical case of SJS

the patient first develops a rash and then a fever, and that on October 6, 2006, Coleman had an erythematous macular popular rash, which is similar to a sunburn that involves bumps over the body. According to Dr. Farber, SJS is characterized by big blisters involving the eyes and rectum and that Coleman's blisters were not documented by OSU until October 8, 2006. Dr. Farber opined that the mere fact that CMC included vancomycin on Coleman's list of possible allergies does not mean that it caused Coleman's SJS. On cross-examination, Dr. Farber admitted that if he were to accept Coleman's version of events, it would probably change his opinion regarding whether defendant met the standard of care.

{¶20}      Upon review of the testimony and evidence adduced at trial, the court finds that defendant's conduct did not fall below the standard of care. The court is persuaded by the testimony of Dr. Onwe regarding the care he rendered to Coleman on October 4 and 5, 2006. Coleman's insistence that he was not seen by a doctor during that time period conflicts with the timing of events as documented in both the CMC and OSU medical records. Specifically, Coleman testified that he developed a rash and blisters between October 2-4, 2006, but the medical records reveal that Coleman's rash did not develop until October 6, 2006, and the blistering did not begin until October 8, 2006. Moreover, plaintiff's expert, Dr. Chinyadza, conceded that based solely upon the medical records, defendant's care complied with the standard of care.

{¶21}      Plaintiff argues that the doctrine of res ipsa loquitur should be applied in this case; however, the court does not agree. The doctrine of res ipsa loquitur is a rule of evidence which allows the trier of fact to draw an inference of negligence from the facts presented. *Morgan v. Children's Hosp.* (1985), 18 Ohio St.3d 185, 187. The two prerequisites which must be met to warrant the application of the rule are: "(1) that the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that

in the ordinary course of events it would not have occurred if ordinary care had been observed." Id., quoting *Hake v. Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 66-67.

**{¶22}** Dr. Farber testified that, in his opinion, SJS can be caused by a wide range of factors including a respiratory infection, a wide variety of drugs, or an allergic reaction to a foreign antigen. Furthermore, Dr. Chinyadza admitted that there was no way to prove that vancomycin proximately caused Coleman's SJS. Moreover, the experts agree that, based solely upon the medical records, defendant's action did not fall below the standard of care. Additionally, Dr. Chinyadza testified that even if the doctors had discontinued vancomycin on October 4, 2006, Coleman still would have developed SJS, although his reaction would have been less severe. Therefore, the court finds that neither prerequisite for the doctrine of res ipsa loquitur has been met.

**{¶23}** Finally, to the extent that plaintiff contends that defendant is liable for failing to accurately document all of Coleman's complaints, Dr. Chinyadza stated that in his practice, he refers to the nurses' notes in addition to directly speaking with the nurses. Dr. Chinyadza asserted that it would be "normal" for a patient's major complaints to be documented, although he did not elaborate as to what would constitute a major complaint. Dr. Chinyadza testified that the CMC nursing notes do not document any complaints either of a rash or blisters between the dates of October 2 through 6, 2006, even though Coleman maintains that he made such complaints on those dates. Dr. Chinyadza admitted that he did not know whether nurses are required to document every single patient complaint.

**{¶24}** Plaintiff has failed to persuade the court by a preponderance of the evidence that defendant's documentation of Coleman's complaints while at CMC fell below the standard of care. Even if the court were to agree that the standard of care requires nurses to document every patient complaint on each day the patient is seen, as stated previously, the court is not persuaded that Coleman's testimony properly

chronicles the sequence of events.  In short, plaintiff failed to persuade the court by a preponderance of the evidence that defendant breached the standard of care with respect to CMC medical records documentation.

{¶25} For the foregoing reasons, the court concludes that plaintiff has failed to prove her claims by a preponderance of the evidence and that judgment shall be entered for defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ANGELIA Y. KING-COLEMAN, Admx.

    Plaintiff

    v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

    Defendant
Case No. 2007-08937

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

{¶1} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
CLARK B. WEAVER SR.
Judge

cc:

Anne B. Strait
Naomi H. Maletz
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Marvin K. Jacobs
1122 Adams Street
Toledo, Ohio 43604

Mark I. Jacobs
241 North Superior Street, Suite 200
Toledo, Ohio 43604-1253

GWP/dms
Filed August 22, 2011
To S.C. reporter October 13, 2011